CASEY'S GENERAL STORES,
INC., Appellee,

v.

Steven H. BLACKFORD, Appellant,

IOWA CIVIL RIGHTS COMMISSION,
Respondent.

No. 01–1270.

Supreme Court of Iowa.

April 2, 2003.

Rehearing Denied May 23, 2003.

David H. Goldman of Babich, Goldman, Cashatt & Renzo, P.C., Des Moines, for appellant.

Edward W. Remsburg, Elizabeth Gregg Kennedy, and Nathan J. Overberg of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellee.

CADY, Justice.

In this appeal, we must decide if the district court erred in dismissing a disability discrimination claim brought under the Iowa Civil Rights Act by an employee against his employer for failing to reassign him to a non-driving position or grant him a leave of absence after his driver's license

was suspended and he was unable to perform the essential functions of his job as a truck driver. The Civil Rights Commission awarded the employee damages, and the district court dismissed the claim on judicial review. On our review, we affirm the district court.

## I. Background Facts and Proceedings.

Steve Blackford was employed by Casey's General Stores, Inc. (Casey's), as a grocery truck driver. He began working for Casey's in 1983. He was terminated from his employment on October 3, 1990, the same day his driver's license was revoked by the Iowa Department of Transportation following an off-duty arrest for operating while intoxicated (OWI) in July 1990. A valid commercial driver's license was a requirement for his employment as a truck driver for Casey's.

On January 14, 1991, Blackford filed a complaint with the Iowa Civil Rights Commission (Commission) alleging Casey's discriminated against him by terminating his employment based on a disability. Blackford claimed he was an alcoholic and was terminated from his employment because of his disability.

On February 9, 1993, following a lengthy investigation, the Commission determined there was probable cause to support the complaint, and the matter eventually proceeded to a hearing. Following numerous administrative hearings over a period of several years, the Commission determined that "Casey's discriminated against Blackford on the basis of his disability (alcoholism) by failing to accommodate his disability and discharging him from employment in violation of the Iowa Civil Rights Act." It awarded Blackford $143,905 in economic losses and $20,000 in emotional distress damages as well as interest, attorney fees, and contested case costs.

The Commission found ample evidence that Casey's knew of Blackford's long history of alcohol abuse outside the hours of his employment. It also found Casey's had a company policy to deal with employees charged with OWI, which included intervention and possible substance abuse assessment and treatment. Casey's did not follow this policy by investigating Blackford after it learned of his arrest for OWI.

The Commission also found Casey's maintained a transfer policy, which permitted employees to transfer to other positions within their department or to other departments. There was evidence that Blackford was not disqualified from this policy because of his arrest and conviction for OWI. Casey's also had a temporary leave of absence policy that possibly could have been used to assist in effectuating a transfer in the event there was no position immediately available for Blackford to fill. Casey's knew Blackford had been arrested for OWI and that his driver's license would be suspended if convicted of the criminal offense.

Although Blackford initially asked Casey's to assist him in applying for a temporary restricted license to enable him to continue to drive a truck once his regular driver's license was suspended, he later inquired into a transfer to a non-driving position. Blackford first considered the possibility of a transfer in August 1990 based on a suggestion by the supervisor of the vehicle maintenance department. The supervisor thought Blackford might be able to switch jobs with an employee in the vehicle maintenance department. A job in the vehicle maintenance department did not require a commercial driver's license. Blackford talked to his supervisor about the job switch and was told a decision would need to be made by the company vice president in charge of transportation.

The transportation division of the company included gasoline drivers, grocery drivers, and the vehicle maintenance department.

The vice president in charge of transportation subsequently telephoned the vehicle maintenance supervisor to inquire if the maintenance department had any open positions. He was told there were no open positions, but the supervisor mentioned an opening could possibly be created through a three-way job switch. However, no action was taken by Casey's to accomplish the switch.

A few days before Blackford was terminated, he spoke directly to the vice president about creating an opening in the vehicle maintenance department through the three-way job switch, and also mentioned the specific employees who would be involved. He also told the vice president that there must be some available job within the company he could perform. Blackford was terminated a few days later.

The vice president in charge of transportation did not consider the possibility of transferring Blackford outside the transportation department. Furthermore, neither he nor Blackford's supervisor checked with the company vice president in charge of human resources to see if there were any open non-driving positions in other departments within the company that Blackford would have been qualified to perform. There was evidence suggesting that, in light of the large number of employees that work for Casey's, such a position would have been available if the search would have started when Blackford first began to inquire about a transfer. Blackford did not mention the possibility of taking a leave of absence prior to his termination.

The Commission found Blackford established a prima facie case of discrimination, and that the reasons Casey's offered to explain its failure to accommodate Blackford by transferring him to a non-driving position or placing him on a leave of absence were pretextual.[1] Casey's basically claimed it did not transfer Blackford because there were no open positions once Blackford gave up his efforts to keep his driving job through a temporary driver's license and started to look into a transfer. It also claimed Blackford never made a specific request for a transfer, or requested to be placed on a leave of absence.

On judicial review, the district court held that the uncontradicted evidence before the Commission showed Blackford was fired by Casey's because he lost his driver's license for a job that required him to have a driver's license, and not because of his status as an alcoholic. It found this meant Blackford could not establish he suffered any adverse employment decision because of his disability. Additionally, the district court found Blackford failed to establish he was qualified to work because Casey's had no duty to transfer Blackford to a non-driving position. Furthermore, the district court found Casey's did not discriminate against Blackford by preventing or interfering with any of his efforts to seek a transfer. Accordingly, the district court reversed the Commission decision

---

1. Blackford originally claimed discrimination based on the failure of Casey's to accommodate him in his truck driving job by helping him obtain a restricted license, the failure to place him on an unpaid leave of absence during the period of his suspension or until another job became available, and the failure to transfer him to a non-driving position. The Commission found discrimination on all three grounds, but Blackford dropped his temporary restricted license argument on appeal. Moreover, he merged the leave of absence and failure to transfer claims, and urges that the Commission's decision should be reinstated based on Casey's failure to transfer him or to grant him a leave of absence until a transfer was available. Thus, we do not address the temporary restricted license claim.

and dismissed the complaint filed by Blackford.

On appeal, Blackford argues the district court erred by relying upon Casey's misconduct defense to reverse a decision of the Commission. Blackford asserts this defense is inapplicable to this case because he does not claim he was qualified to continue his employment as a truck driver, and because he was not claiming that Casey's should have accommodated him in his driving job by helping him obtain a temporary license so that he could continue to drive. Instead, Blackford asserts the district court erred in failing to recognize his separate claim of discrimination when Casey's failed to transfer him pursuant to the company transfer policy to another job within the company that he would have been qualified to perform. Blackford argues there is substantial evidence in the record to support the finding made by the Commission that Blackford established a prima facie case of discrimination based on Casey's failure to transfer him to a nondriving job because he was an alcoholic, and that the reasons asserted by Casey's for failing to transfer were pretextual.

## II. Standard of Review.

Our review is prescripted by the Iowa Administrative Procedure Act. Iowa Code § 17A.19(8) (2001). Generally, our review is akin to review for errors at law.

## III. Disability Discrimination—Statutory Framework.

 The Iowa Civil Rights Act prohibits an employer from discriminating against a qualified person with a disability because of the person's disability. Iowa Code § 216.6(1); *see also Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994). The statute, however, only pronounces a general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute. *See Schlitzer v. Univ. of Iowa Hosps. & Clinics,* 641 N.W.2d 525, 529 (Iowa 2002) (federal Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101–213, is instructive in applying our statute); *Boelman,* 522 N.W.2d at 79 (Federal Rehabilitation Act, 29 U.S.C. § 794, used as a guide in applying our statute). Like the ADA, to recover under the Iowa statute, a claimant must establish: (1) he or she is a disabled person; (2) he or she is qualified to perform the job, with or without an accommodation; and (3) he or she suffered an adverse employment decision because of the disability.[2] *Schlitzer,* 641 N.W.2d at 530.

Generally, if a claimant establishes these three elements, the burden shifts to the employer to show a legitimate nondiscriminatory reason for the adverse employment

---

**2.** There are two basic theories of employment discrimination, both applicable to disability cases: disparate treatment and disparate impact. Disparate treatment occurs when an employer treats a person less favorably than others because of his or her protected characteristic, such as a disability. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338, 346 (1993). The claimant must prove an adverse employment decision based on a disability. Disparate impact involves facially neutral employment practices or fixed qualifications that in fact impact one group, such as the disabled,

more harshly than others and "cannot be justified by business necessity" or the particular business activity involved. *Id.* Here, proof of a discriminatory motive is not required. *Id.* Blackford limits his claim in this case to a disparate treatment theory. He makes no claim under a disparate impact theory. *See Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195–96 (7th Cir.1997) (employer rule that truck driver have valid driver's license or pilot have good vision bears more heavily on the disabled than the non-disabled, but is permitted because it is reasonable).

decision. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 678 (1973); *Boelman,* 522 N.W.2d at 79–80. Once an employer proffers a legitimate nondiscriminatory reason, the burden shifts back to the claimant to show the reason proffered by the employer is pretextual.[3]

### A. Disabled Person.

■ The civil rights statute broadly defines a disability as a "physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5). We have previously recognized alcoholism to be a disability. *See Consol. Freightways, Inc. v. Cedar Rapids Civil Rights Comm'n,* 366 N.W.2d 522, 528 (Iowa 1985). Thus, like its federal ADA counterpart, alcoholism is covered under the statute as a disability. *See Duda v. Bd. of Educ.,* 133 F.3d 1054, 1059 n. 10 (7th Cir.1998) (citing cases finding alcoholism is covered under the ADA); *Evans v. Fed. Express Corp.,* 133 F.3d 137, 139 (1st Cir.1998) (same).

### B. Qualified Person.

■■ The second element of a discrimination claim under the statute requires claimants to establish they are qualified persons for the job by showing they can " 'perform the essential functions of [the position] with or without accommodation.' " *Schlitzer,* 641 N.W.2d at 530 (citation omitted); *see Miller v. Sioux Gateway Fire Dep't,* 497 N.W.2d 838, 841 (Iowa 1993) (a qualified person is one who can perform the essential functions of a job "in spite of" a disability). In *Schlitzer,* we recognized this showing requires the court to consider whether the claimant has ' " 'the requisite skill, experience, education and other job-related requirements of the employment position that such individual *holds or desires.' " '* *Schlitzer,* 641 N.W.2d at 531 (citation omitted). If the claimant proves he or she "can perform the essential functions of the job," the qualified person element is met. *Boelman,* 522 N.W.2d at 80. If not, then an additional inquiry must be made to determine if a "reasonable accommodation by the employer would enable [the claimant] to perform the essential functions." *Id.; see Schlitzer,* 641 N.W.2d at 530 (applying the shifting burden analysis). An employer, under Iowa law, "must make 'a reasonable effort' to accommodate an employee's disability." *Courtney v. Am. Nat'l Can Co.,* 537 N.W.2d 681, 687 (Iowa 1995) (citation omitted).

---

**3.** This analysis is not followed in all discrimination cases. The *McDonnell Douglas* analysis was formulated because direct evidence of discrimination is frequently unavailable, and an employee must rely on circumstantial evidence to establish discriminatory intent. *See U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 411 (1983). Thus, special burden of proof rules were developed to allocate the order of proof to resolve "the elusive factual question of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207, 216 n. 8 (1981). The *McDonnell Douglas* approach applies to pretext claims, and is modified somewhat under a mixed-motive case. *See Boelman v.* *Manson State Bank,* 522 N.W.2d 73, 78 (Iowa 1994). However, it is unnecessary to engage in the analysis in a direct evidence case where the issue centers on whether the use of the prohibited factor was appropriate. *See id.; Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996). Furthermore, many courts have concluded that the *McDonnell Douglas* analysis is inapplicable to reasonable accommodation claims where the issue is whether the employer failed to reasonably accommodate the employee's disability. *See Walsted v.. Woodbury County,* 113 F.Supp.2d 1318, 1326 n. 3 (N.D.Iowa 2000); *Canteen Corp. v. Pennsylvania Human Relations Comm'n,* 814 A.2d 805, 811–12 (Pa.Cmwlth.2003).

■ We further emphasized in *Schlitzer* that the duty to reasonably accommodate a claimant applies not only to an existing job, but also includes a job the claimant desires. *Schlitzer,* 641 N.W.2d at 530–31; *see* 42 U.S.C. § 12111(9) (2000) (reasonable accommodation includes "reassignment to a vacant position"); *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1161–63 (10th Cir.1999) ("qualified individual" under the ADA includes disabled employees who can perform a desired reassignment job, with or without an accommodation, though unable to perform their existing job); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1300–01 (D.C.Cir.1998). Thus, like the federal ADA counterpart, our statute should not only protect a disabled person who can perform the essential functions of a position the person holds, with or without an accommodation, but also protect a disabled person who can perform the essential functions of a desired job, with or without an accommodation. *Schlitzer,* 641 N.W.2d at 530–31. This means an employer has some obligation, based on the employee's initiation of the process, to reassign a disabled employee who has become disabled and can no longer perform the essential functions of his or her job as a reasonable accommodation. *Id.*

■ We have not fully illuminated the parameters of this obligation to accommodate through reassignment, but it is clear it involves an interactive process that engages the employee and employer to work in concert to achieve a reasonable accommodation once the employee has expressed a desire for reassignment. *See Smith,* 180 F.3d at 1170–78. At the same time, an accommodation by reassignment does not require an employer to respond by creating a vacant position. *Schlitzer,* 641 N.W.2d at 530. Additionally, an employee who seeks reassignment as an accommodation to a disability must identify a specific available job the employee is qualified to perform to ultimately recover under the statute. *Id.* at 530–32. Even if an employer fails to fully assist an employee in a request for reassignment, the employee must still show a specific position was available that he or she could have sought. *See Burns v. Coca–Cola Enters., Inc.,* 222 F.3d 247, 258 (6th Cir.2000); *Smith,* 180 F.3d at 1174. Without this showing, an employee cannot establish he or she is a qualified person. *Schlitzer,* 641 N.W.2d at 530–32.

**C. Adverse Employment Decision.**

The final element requires the claimant to show he or she suffered an adverse employment decision because of his or her disability. *Id.* at 530. This element generally considers the existence of discrimination, and primarily focuses on the reasons for the adverse employment decision or action. Once a claimant establishes a prima facie case, this element considers the employer's proffer of a legitimate nondiscriminatory reason under the *McDonnell Douglas* analysis, as well as evidence that the employer's reason is a pretext for discrimination. *See Price v. S–B Power Tool,* 75 F.3d 362, 366 (8th Cir.1996). Additionally, this element can properly consider the failure to make a reasonable accommodation. Under the ADA, the failure to make a reasonable accommodation for an otherwise qualified person with a disability constitutes discrimination. *See* 42 U.S.C. § 12112(b)(5)(A); *Smith,* 180 F.3d at 1167 (failure to reassign is an act of discrimination). Thus, the failure of an employer to make a reasonable accommodation can be a separate claim for recovery. *See Carroll v. Xerox Corp.,* 294 F.3d 231, 237–38 (1st Cir.2002).

**IV. Blackford's Status as a Disabled Person.**

The parties stipulated Blackford was an alcoholic with a serious drinking problem. He was disabled under the statute. Thus,

the first element of the claim was established.

### V. Blackford's Status as a Qualified Person.

Casey's contends Blackford failed to establish he was a qualified person as a matter of law because he was rendered unqualified to perform his job due to the loss of his driver's license, not his disability. Similarly, Casey's claims it had no obligation to accommodate Blackford through a transfer to a different job or a leave of absence because his inability to perform his existing job was not based on his disability but a legal impediment resulting from his criminal conduct. These arguments essentially challenge the second element of a discrimination claim, and were accepted by the district court as grounds for reversing the Commission and dismissing the complaint.[4]

We have not fully addressed the significance of a distinction between disability and conduct, and its impact on a discrimination claim under section 216.6. We have indicated that our statute permits an employee to establish a discriminatory motive under the third element of a claim as long as the conduct claimed to support the termination is causally related to the disability. *Boelman*, 522 N.W.2d at 77–78 (employee who suffered from job performance problems related to his multiple sclerosis was discharged because of his disability). At the same time, we have recognized that disability-related conduct is properly considered in determining whether an employee is qualified to perform the essential functions of a job under the second element of a claim. *Id.* at 80–81. However, we have not considered the impact of a

disabled worker's inability to perform the essential functions of a job as a result of misconduct or other consequences of illegal activity on the qualified person element of a claim or the employer's duty to accommodate.

We agree with Casey's that our statute exists to prohibit discrimination based on a disability, not matters unrelated to disability. Additionally, some courts have drawn a distinction between a disability and disability-caused misconduct, and concluded that employers do not need to make reasonable accommodations when the inability of a disabled worker to qualify for a job resulted from misconduct. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1087–88 (10th Cir.1997); *Harris v. Polk County, Iowa*, 103 F.3d 696, 697 (8th Cir.1996). However, a close examination of these cases reveals that the dichotomy established between disability and misconduct under the ADA applies only in the context of alcoholism and illegal use of drugs. *Den Hartog*, 129 F.3d at 1086. It is limited to alcoholism and drug use because the ADA specifically carves out an exception for alcoholism and drug use. *See* 42 U.S.C. § 12114(c)(4). This section provides employers

> may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee.

*Id.*

Notwithstanding, it is unnecessary for us to decide in this case if our state statute

---

4. The failure of an employer to accommodate may also impact the third element of a discrimination claim. Discrimination is defined under the ADA to include the failure to make a reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A) (2000). Because we ultimately find this case is resolved based upon the failure of proof under the second element, it is not necessary for us to address the issues raised under the third element.

would follow the ADA treatment of alcoholism or would otherwise recognize the distinction between disability and misconduct urged by Casey's. This is because Blackford avoids any clash with Casey's arguments by emphasizing that his claim does not involve Casey's decision to terminate him from his position as a truck driver or his qualifications as a truck driver, but instead involves the failure of Casey's to reassign him to another job once he could no longer perform the truck driving job. Furthermore, Blackford points out that his claim is not based on reassignment under the statutory duty of an employer to accommodate his disability, but under the company transfer policy. Thus, Blackford asserts that his claim boils down to one of disparate treatment based on the failure of Casey's to transfer him to a non-driving position in the same manner as other non-disabled employees have been transferred. Under this approach, Blackford only seeks protection under the statute as an alcoholic, on grounds that the statute requires the employer to consider him for reassignment to another position the same as any other employee who seeks reassignment. These claims are consistent with the findings of the Commission in this case. It found Blackford informed Casey's he wanted to transfer to a non-driving position and that such a position would have most likely been found if Casey's had promptly considered his request. It is also consistent with the Commission's finding that Casey's did not transfer him to a non-driving position because he was an alcoholic. Thus, we consider Blackford's claim in the manner he asserts it was presented to and decided by the Commission.

■ We first consider the claim based on Casey's failure to reassign Blackford separate from the leave of absence claim. We agree with Blackford that the statute separately prohibits an employer from discriminating against a disabled employee who seeks to transfer from an existing position to a vacant position, in addition to prohibiting an employer from discriminating against an employee who is no longer able to perform an existing job and seeks reassignment as a reasonable accommodation. *Smith,* 180 F.3d at 1164 (an employer cannot discriminate against a "disabled individual on the basis of his or her disability" whether the person is "an existing employee seeking reassignment or an outside job placement"). Thus, our statute protects Blackford from discrimination, as he claims, whether he is seeking a reassignment as an accommodation or as an applicant for an open position independent of an accommodation. *See Sch. Bd. of Nassau County v. Arline,* 480 U.S. 273, 289 n. 19, 107 S.Ct. 1123, 1131 n. 19, 94 L.Ed.2d 307, 321 n. 19 (1987) (although the Rehabilitation Act initially made no mention of a duty to accommodate, and the corresponding regulations to the act limited the definition of "qualified" to the particular position in question, an employer was still obligated to find an alternative job for a disabled worker if the employer normally did so under an existing transfer policy). Yet, in both instances, a claimant must establish all three elements to recover, including the second element that he or she is qualified to perform the job held or desired.

Although we interpret our statute to impose a duty on an employer to accommodate a worker who is unable to perform his or her job because of a disability, we still require an employee who seeks reassignment as an accommodation to show, as a predicate to recovery, that reassignment to a vacant position could have been accomplished. *Smith,* 180 F.3d at 1174. It is not enough for the employee to make a general claim of the existence of the vacant position. The employee must specifically identify the position or positions that were available. *Id.* at 1179; *Schlitzer,* 641

N.W.2d at 531. It is only in the context of a particular job that the court can evaluate a claimant's qualifications to perform its essential functions. *Schlitzer*, 641 N.W.2d at 531.

We are unable to identify any reason to drop this requirement of an employee to identify a specific open position when reassignment is sought independent of the employer's duty of accommodation. Just as in accommodation claims, when the court is presented with a disparate treatment case based on the failure to reassign, it must evaluate a claimant's qualifications in the context of the essential functions of a particular job. Additionally, it is basic to our statute that a claim must be premised on a particular job held, or one that is sought or desired. Thus, even if an employee relies on a company transfer policy, instead of the statutory obligation to reassign, the employee must still identify a specific available position.

Under the record, it is clear, as Casey's argues, that the Commission erred in finding Blackford was a qualified person. At best, the evidence produced by Blackford showed that a three-way job switch was possible. Additionally, the evidence showed it was likely that some job could have been found for Blackford if Casey's would have used its full resources to locate an open position. Yet, this evidence falls below the necessary standard of proof.[5]

"An employer is not required to create a vacancy." *Id.* at 530. Nor are employers required to "displace existing employees from their positions." *Burns*, 222 F.3d at 257. A job switch arrangement requires an employer both to create an opening and to displace an existing employee. Thus, evidence of a possible job switch does not satisfy the requirement to identify a specific available job. Furthermore, an employee cannot satisfy the requirement to specifically identify a vacant position by evidence that some job could have been found at the time the request for reassignment was made if the company had done more to find a job. A general interest in some job is insufficient to establish the qualified person element of a discrimination claim. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir.2000).

The record did reveal evidence presented at one of the administrative hearings indicating Casey's hired some new employees for jobs Blackford likely would have been qualified to perform, such as ground and building maintenance positions, during the relevant time frame after Blackford began to inquire into a possible transfer. Nevertheless, this type of evidence does not aid Blackford's claim under the circumstances because there was no additional evidence Blackford sought these jobs or that the company transfer policy required Casey's to notify Blackford of these jobs or help him secure a job. Blackford's claim

---

**5.** In a case where the duty of an employer to accomodate a disability is at issue, we recognize the failure of an employer to properly respond to an employee's request for reassignment can make it difficult for a claimant to prove a specific vacant position was available. However, our statute protects against disability in existing or open employment positions, and does not establish a preference for disabled workers. While the failure of an employer to fully engage in the interactive process may affect an employer's ability to resolve a discrimination claim by summary judgment proceedings, it does not alleviate the need for the claimant to establish a vacant position was available to ultimately recover. *See Hines v. Chrysler Corp.*, 231 F.Supp.2d 1027, 1050–53 (D.Colo.2002). If a position would have been available at the time a request for reassignment was made, the normal discovery process in the course of litigation will bear it out. A claimant cannot rely on his or her general knowledge or the employer's lack of accommodation efforts, but must ultimately present evidence at trial of a vacant position he or she would have been qualified to perform.

did not implicate Casey's duty to accommodate his disability through a transfer. Moreover, the transfer policy was extremely vague, and at best, only encouraged department heads to post open jobs to allow existing employees to apply for the jobs before opening the positions to new employees. There was no evidence Blackford followed this policy or that he requested a transfer to a specific open position. In the context of Blackford's specific claim of discrimination, he was required to identify a specific job he actually sought or desired to support his claim for discrimination.

Likewise, the discrimination claim by Blackford based on the leave of absence must also fail. The leave of absence claim is tied to the transfer claim, and was argued by Blackford only on the basis that a leave of absence could have been used to assist Blackford in accomplishing a transfer to a non-driving job in the event such a job was not immediately available at the time Blackford lost his license and was unable to work as a driver. Blackford never sought a leave of absence, but specifically argues on appeal that it was a way of effectuating the transfer.

Although this argument might expand the window of time for an employee to show a vacant position was available, an employee must still establish an open position would have been available during this window of time. Blackford has not presented any evidence of a specific vacant position for which he qualified during any period of time. Accordingly, the claim must fail.

Like the ADA, our unfair employment practices statute exists to eliminate discrimination against persons with disabilities, as well as discrimination based on other protected characteristics. *See Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 487 (8th Cir.1996) (quoting 42 U.S.C. § 12101(b)(1)). We interpret the statute consistent with this purpose so that persons with disabilities will not suffer discrimination at the hands of employers in this state. *See Miller v. Westfield Ins. Co.,* 606 N.W.2d 301, 303 (Iowa 2000) (a statute is construed to best effectuate its purpose and redress wrongs sought to be remedied). Nevertheless, standards have been developed as a predicate to recovery of claims, one of which requires a claimant seeking reassignment to show he or she was qualified to perform a specific vacant position sought. Blackford failed to satisfy this burden. In reaching this conclusion under this record, we recognize neither party had the benefit of *Schlitzer,* nor the other law that has been developed in this rapidly growing area since the claim was first brought. *Schlitzer* was our first opportunity to develop the requirement to identify an open position, and we are still shaping the meaning of an employer's duty to accommodate. Yet, judicial decisions generally operate retroactively and prospectively, and we apply the law to a case that exists at the time the case comes before us. *See N. River Ins. Co. v. Iowa Div. of Ins.,* 501 N.W.2d 542, 546 (Iowa 1993); *In re Estate of Weidman,* 476 N.W.2d 357, 361 (Iowa 1991). There is no reason to deviate from this rule.

## VI. Conclusion.

We conclude as a matter of law that Blackford failed to establish he was a qualified employee. There was insufficient evidence to show a specific vacant job was available during the period of time he sought reassignment. For this reason, his claim for discrimination must fail, and we need not address the remaining issues. We affirm the district court.

**AFFIRMED.**